O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Case No. CR 08-566 CAS |
| Petitioner, ) | |
| ) | **FINDINGS OF FACT AND** |
| vs. ) | **CONCLUSIONS OF LAW** |
| ) | |
| KATHY STAMPS, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

## I.    INTRODUCTION

On May 13, 2008, a federal grand jury in the Central District of California returned a three-count indictment ("the indictment") against defendant Kathy Stamps. The indictment charges defendant in all three counts with mail fraud, a violation of 18 U.S.C. § 1341. The indictment also notifies defendant that the government will be pursuing criminal forfeiture of certain assets pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853 and 28 U.S.C. § 2461(c). Following defendant's knowing and voluntary waiver of her right to trial by a jury, a bench trial was held on June 17, 2010. After carefully considering the arguments of the parties, the Court finds and concludes as follows:

## II.     FINDINGS OF FACT

1.      Beginning on or about January 24, 2002, and continuing through in or about October 2004, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and with intent to defraud devised, participated in, and executed a scheme to defraud the United States as to material matters, and to obtain money and property from the United States by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

2.      Defendant directed her scheme to defraud to the United State Forest Service, where she was employed as an accountant for the Angeles National Forest ("the Angeles").  One of defendant's responsibilities at the Angeles was to administer the funds contributed to the Forest Service's Cooperative Works Program ("CWFS") pursuant to Title 16, United States Code, Section 498 ("the Act").  The Act authorized private vendors, also known as "cooperators," to contribute money to the United States Forest Service to pay for work projects on Forest Service land pursuant to a "cooperation agreement."  Defendant was also responsible for administering the royalty payments provided by mining companies for minerals being extracted from the Angeles.        3.      All of the mining royalties and other money contributed for work projects was deposited into what the Forest Service referred to as a "lock box," a bank account maintained by the United States Treasury at a local bank.  Once the money was deposited into the lock box, it became public money and neither the mining companies nor the cooperators could access or withdraw that money.

4.      The Forest Service kept track of the money being deposited into the lock box using the Foundation Financial Information System (or "FFIS"), its on-line accounting system.  The Forest Service also labeled the money being deposited into lock box based on the purpose for which the it had been deposited.  For example, mining royalties were typically labeled "5008" money, which meant the money had been deposited in exchange for using National Forest lands.  Budget Clearing (or "BCBC") money is money that is presumed to belong to the government, but could not be assigned

a more specific label.  Suspense money is money that was expected to be refunded back to the depositor if the depositor complied with the terms of the agreement he had entered into with the Forest Service.  Regardless of label, all of the money deposited into the lock box account is public money under the custody and control of the federal government, which means that a certifying officer must approve a refund of that money before it would be given back to the contributor.

     5.    If the mining companies or the cooperators believe that they are entitled to a refund, they are required to submit a request for a refund to the Budget and Finance Office where defendant worked.  As the accountant for the Angeles, defendant had sole responsibility for processing the refund requests filed by the cooperators and mining companies.  Defendant would submit those request to Charity Burton, a certifying official, for approval.  The form defendant used to submit the request to Charity Burton was known as a Public Voucher.  Charity Burton would not approve a Public Voucher, unless defendant attached supporting documentation.  Typically, the Public Voucher request defendant submitted to Charity Burton would have as attachments (1) the letter requesting a refund, (2) the cooperation or mining agreement explaining how much money had been deposited, and (3) the FFIS printout showing how much of that money was still in the account.  Charity Burton trusted defendant because of a friendship they had developed both inside and outside of work.  As a result, Charity Burton never questioned the authenticity of the documents defendant submitted in connection with Public Vouchers and did not scrutinize those documents.

     6.    On or about May 16, 2002, defendant began executing her scheme to defraud the United States by renting a commercial mailbox with the address 122A E. Foothill Boulevard, Suite #244, Arcadia, California.  Ex. 48.  Defendant then incorporated "DKLD As One, Incorporated" ("DKLD").  Ex. 51.  Defendant requested and received a tax identification number for DKLD, which was 43-XXX041.  Ex. 53. On July 15, 2002, defendant used DKLD's name, DKLD's tax identification number, and the commercial mailbox address to enter DKLD into the FFIS accounting system as

3

a Forest Service vendor. Defendant created the DKLD account in FFIS knowing that the Forest Service had never entered into any cooperative or mining agreements with DKLD.

7. The day before defendant entered DKLD into the FFIS system, she began submitting fraudulent Public Voucher requests to Charity Burton for approval. Defendant submitted a total of six fraudulent Public Vouchers to Charity Burton for approval knowing they were fraudulent. Each of those requests was fraudulent, in that it contained material misrepresentations, fraudulent pretenses, and concealed material facts. For example, defendant created fictitious letters to make it appear that either the cooperator, the mining company, or the project manager was requesting that money be refunded. Steve Bear, whose responsibility it was to prepare or receive the letters requesting a refund, testified that he had no record or memory of the fictitious letters or the refund requests.

8. Defendant also created fictitious cooperation agreements purportedly entered into between the Forest Service and DKLD, which she used to support three out of the six fraudulent Public Voucher requests she submitted to Charity Burton. Exs. 1 (Bates No. 2848), Ex. 5 (Bates No. 2838) and Ex. 13 (Bates No. 2825). All of the individuals who purportedly signed these fictitious cooperation agreements on behalf of DKLD, including Charles Snead, Jr., Roger Haga, and Michael Thau, testified that they have never heard of DKLD and never signed the fictitious cooperation agreement. Charity Burton and Maria Holguin were certain that defendant was the one who submitted all six of the fraudulent Public Vouchers, because defendant had sole responsibility for submitting those vouchers and her handwriting was each one of the requests.

9. The last three fraudulent Public Vouchers defendant submitted to Charity Burton for approval, which were charged in counts one through three of the indictment, involved over $1 million that had been deposited into the lock box by CAL MAT, a mining company with a legitimate mineral extraction agreement with the Forest Service.

Defendant was able to submit the fraudulent Public Vouchers on behalf of CAL MAT, in part, because she used her access to the FFIS system to fraudulently change CAL MAT's mailing address to 122A E. Foothill Boulevard, Arcadia, California. Cf. Exs. 15, 16 and 19.

10. All six of the fraudulent Public Vouchers defendant submitted to Charity Burton were approved and later transmitted to the United States Treasury's National Finance Center for payment. The United States Treasury issued six Treasury checks as a result of the fraudulent Public Vouchers defendant submitted, which were each separately placed in an authorized repository for mail matter on the dates specified in counts one through three of the indictment and sent via the United States Postal Service to defendant's commercial mailbox address of 122A E. Foothill Boulevard, Suite #244, Arcadia, California.

11. All six of the Treasury checks ($1,421,390.39) were deposited into defendant's Bank of America bank accounts. Ex. 38. Defendant spent $1,090,744.80 on personal items, including over $100,000 in cash withdrawals, $12,500 to invest in a Wingstop restaurant franchise, $64,843.92 in car payments, $36,761.07 in jewelry, and over $50,000 in mortgage payments.

12. To the extent necessary, each of these Findings of Fact may be deemed to be a Conclusion of Law.

## III. CONCLUSIONS OF LAW

Counts one through three of the Indictment charges defendant with mail fraud in violation of 18 U.S.C. § 1341 and causing an act to be done in violation of 18 U.S.C. § 2(b). The indictment also seeks Criminal Forfeiture pursuant to 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 853. In order to prove mail fraud, the government must prove each of the following elements beyond a reasonable doubt: (1) the defendant made up or participated in a scheme or plan for obtaining money or property by making false promises or statements; (2) the defendant knew that the

promises or statements were false; (3) the promises or statements were material, that is they would reasonably influence a person to part with money or property; (4) the defendant acted with the intent to defraud; and (5) the defendant used, or caused to be used, the mails to carry out or to attempt to carry out an essential part of the scheme or plan.  See Ninth Cir. Crim. Jury Instr. 8.121 (2010).

Defendant only challenges the government's ability to satisfy the third element of the offense.  (RT 6/18/10 94).  According to defendant, in order to satisfy this element, the government must prove beyond a reasonable doubt that it had "100 percent control [and] ownership of these funds."  (RT 6/18/10 103).  Defendant's argument fails for the reasons set forth below.

Defendant's argument that the government has failed to meet the third element of the offense is based on a misreading of McNally v. United States, 483 U.S. 350 (1987), and its progeny.  In McNally, a former public official of the Commonwealth of Kentucky and a private individual were charged with mail fraud for "participation in a self-dealing patronage scheme" under the theory that the scheme "defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly."  Id. at 352.  Holding that a conviction under this section could not be upheld, the Supreme Court noted that history "indicates that the original impetus behind the mail fraud statute was to protect people from schemes to deprive them of their money or property" and "the deprivation of something of value." Id. at 357-58.  Therefore, while the statute "clearly protects property rights, [it] does not refer to the intangible right of the citizenry to good government." Id.

The reasoning in McNally was applied in United States v. F.J. Vollmer & Co., 1 F.3d 1511 (7th Cir. 1993), where the Seventh Circuit held that the government, specifically the Bureau of Alcohol, Tobacco, and Firearms (BATF), did not have a sufficient property interest in its right to control the disposition of firearms to charge mail fraud.  Id.  The court found that the object of defendant's scheme, which was to defraud BATF of its function of regulating the importation and sale of firearms, could

not be charged as mail fraud, because "[i]t is well established that the government's regulatory interests are not protected by the mail fraud statute." Id. at 1521. In other words, the government failed to demonstrate a sufficient property interest in the property in question, which was derived from a legislative grant of regulatory authority, which the court found "convey[ed] no property interest." Id.

The Ninth Circuit reached a similar conclusion in United States v. Dadanian, 856 F.2d 1391, 1392 (9th Cir. 1988), where it held that the defendant's scheme to defraud the government to obtain a gambling license could not be charged under the mail fraud statute because the scheme "did not affect the City of Bell's interests as a property-holder." The Ninth Circuit later relied on Dadanian to dismiss a mail fraud charge in United States v. Kato, 878 F.2d 267, 269 (9th Cir. 1989), where the defendant was charged with "violating the mail fraud statute by devising a scheme to defraud the United States into issuing private pilots certificates to those unqualified and/or ineligible to receive them." Id. The Ninth Circuit again held that the scheme did not affect the government's interests as a property holder, because the issuance of licenses is an intangible right, which was not encompassed in section 1341. Id.

In Cleveland v. United States, 531 U.S. 12 (2000), the Supreme Court reaffirmed its holding in McNally, finding that State of Louisiana did not part with "property" within the meaning of the mail fraud statute when it issued a license to operate video poker machines, which the Court deemed to be an "intangible right" of the power to regulate. Cleveland, 531 U.S. at 23.

However, in Pasquantino v. United States, 544 U.S. 349, 353-54 (2005), the Court distinguished McNally and its progeny from cases in which the government could establish an "economic" interest in the object of the scheme. Pasquantino, 544 U.S. at 353. In Pasquantino, the defendant was charged with wire fraud for carrying out a scheme to smuggle large quantities of liquor into Canada from the United States, without paying the required excise taxes. Id. The Court noted that the right to be paid money "has long been thought to be a species of property" and held the defendant was properly

7

convicted under the wire fraud statute. Id. at 358. The Court went on to point out that nowhere in Cleveland had the government alleged that the defendant had defrauded government of "any money." Id.

In this case, the government has proven beyond a reasonable doubt that the object of defendant's scheme was to deprive the government of money. In fact, defendant does not dispute that the object of her scheme was to file fraudulent Public Vouchers with the United States Forest Service and thereby obtain money being held in an account owned by the Unites States Treasury. The plain language of the mail fraud statute, which encompasses any scheme to defraud the victims of money or property, as well as a literal reading of the Supreme Court's ruling in Pasquantino, which held that even the right to collect money "has long been thought to be a species of property," both establish that the government has met its burden of proof in this case. See also, United States v. Howard, 537 F. Supp. 2d 899 (E.D. Mich. 2008) (indictment alleging that the trustee of 401k plan obtained plan funds through mail fraud in violation of §1341 using fraudulent hardship withdrawal requests on behalf of her clients was sufficient to charge trustee with the crime of mail fraud, despite trustee's claim that Merrill Lynch, who held the funds, was not deprived of its own money). "Notwithstanding defendant's argument to the contrary, the payment of money unquestionably 'deprived' Merrill Lynch of money lawfully in its possession." Id. 902.

The fact that it is immaterial who owned the money that was the object of the scheme to defraud is further demonstrated by the Ninth Circuit's holding in United States v. Bonallo, 858 F.2d 1427, 1434 n. 9 (9th Cir. 1988). In Bonallo, the defendant challenged his bank fraud conviction on the ground that the government had failed to prove the bank was the intended victim, since the customers of the bank whose accounts were falsely charged were the actual victims. Id. The Ninth Circuit found this argument unpersuasive, since the misrepresentations the defendant made to carry out the scheme were directed toward the bank. Id. Therefore, based on the Ninth Circuit's analysis in Bonallo, all the government must prove is that defendant devised a scheme for obtaining

money using the mail and that the misrepresentations defendant made in furtherance of that scheme were directed at the government.[1]

### IV.   CONCLUSION

In accordance with the foregoing, the Court hereby finds the defendant GUILTY on counts one through three of the indictment.

IT IS SO ORDERED

Dated: September 16, 2010

                                        CHRISTINA A. SNYDER
                                        UNITED STATES DISTRICT JUDGE

---

[1] The elements of mail fraud and bank fraud are identical. Cf. Ninth Cir. Crim. Jury Instr. 8.121, 8.127 (2010).

"The legislative history of the bank fraud statute strongly indicates that Congress intended that it have the same broad scope as the mail fraud statute, 18 U.S.C. § 1341 et seq. The Senate Report states that the bank fraud statute is "modeled" after that statute. S. Rep. No. 225, 98th Cong., 1st Sess. at 378-79 (1983), reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3519. Like section 1344, the mail and wire fraud provisions in the mail fraud statute apply to any "scheme or artifice to defraud", as well as to "obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341 and 1343. Further, the House Judiciary Committee, in considering the proposed bank fraud statute, expressly endorsed the broad reading courts have given the mail and wire fraud provisions.FN6 This endorsement, along with the fact that the bank fraud statute was "modeled" after the mail fraud statute, makes it clear that Congress sought to apply to bank fraud cases the same broad standard used in determining whether a scheme to defraud is covered by the mail fraud statute." United States v. Bonallo, 858 F.2d supra at 1427.